UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF STERLING HEIGHTS, ET AL.,

        Plaintiffs,

v.

UNITED NATIONAL INSURANCE
COMPANY, ET AL.,

        Defendants.

_____/

Case No. 03-72773

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT  [224] AND GRANTING IN PART
AND DENYING IN PART DEFENDANT SPECIALTY NATIONAL'S CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT [230-231]**

This insurance dispute comes before the Court on the Plaintiffs' and Defendant
Specialty National's cross-motions for partial summary judgment.  For the reasons stated
below, the cross-motions are GRANTED IN PART and DENIED IN PART.

**I.      Background**

Specialty National issued Policy No. 3XZ18115900 to the City of Sterling Heights,
effective September 1, 2002 to May 13, 2003 (the "Policy").  The Policy contains three
relevant coverage parts:  (1) Public Entity General Liability ("GL"), (2) Public Officials
Liability ("POL"), and (3) Umbrella Liability ("Umbrella").  It provides $5 million in primary
coverage and $6 million in Umbrella coverage.  The GL and Umbrella coverage is written
on an occurrence basis.  The POL coverage is written on a claims-made basis.

This Court is familiar with the issues raised in this coverage action as well as the

underlying actions filed against the Plaintiffs ("Insureds"), having presided over the two underlying federal actions brought by the Hillside Plaintiffs against the Insureds and having addressed a number of coverage issues in previous opinions and orders.  Nonetheless, because these cross-motions focus on what the Insureds knew and when, a brief summary of the claims asserted in the two underlying federal actions and the underlying state action are summarized below.

On May 19, 1999, Macomb County, Michigan executed a ten-year sublease with Hillside Productions ("Hillside") providing that Hillside was to manage and operate the "Freedom Hill Amphitheater" at "Freedom Hill Park."  (Def.'s Ex. A.)  The sublease called for Hillside to make certain improvements.  (*Id.*)  It was later amended, extending the term to 12 years and memorializing Hillside's continued agreement to perform further improvements in accordance with a Master Plan developed for the site.  (*Id.*)  Hillside invested millions of dollars in improvements to the Freedom Hill Amphitheater.

Hillside applied to the City of Sterling Heights for a SALU permit on February 9, 2001. (Def.'s Ex. E.)  On February 22, 2001, City Planner Norman Birr ("Birr") submitted a memorandum to the City's Planning Commission recommending approval of the SALU subject to ten conditions, including the requirement that no sound be audible beyond the Freedom Hill property line.   (Def.'s Ex. F.)   On February 28, 2001, the Planning Commission issued Hillside a SALU permit, but modified Birr's proposal to require sound levels not to exceed 100 decibels at the top of the hill.  (Def.'s Ex. G.)[1]

---

[1]On December 30, 2003, the City and the Hillside Plaintiffs stipulated in their Federal Action that the SALU was approved with the City being aware "that the City would not be able to change the specific [100] decibel level" as provided in the SALU.  (Def.'s Ex. G-1.) The Planning Commission was advised by the City Attorney at the February 28, 2001

After the SALU was issued, on April 24, 2001, the City advised Hillside that several factors hindered the issuance of building permits. (Def.'s Ex. H.) Three days later, the City issued Hillside a stop work order. Hillside continued construction pursuant to a May 1, 2001 letter from Jim Perna, Commissioner for the Macomb County Parks and Recreation Commission, advising that the County had sovereign control over Freedom Hill and that the County expected construction to be timely completed. (Def.'s Ex. I.) In a May 3, 2001 letter, City Manager Duchane advised the Macomb County Board of Commissioners that the City Council had instructed him "to enforce the present stop work order subject to the legal opinion of the City Attorney." (Def.'s Ex. J.)

On May 31, 2001, the City sent a letter to Hillside indicating that the City's ordinances applied to the amphitheater project and setting forth conditions under which the City would grant a certificate of occupancy. (Def.'s Ex. K.) These conditions included the payment of fines for alleged violations of stop work orders issued by the City. (*Id.*) According to Hillside, "because of the significant amount of money invested in the project, and the acts already booked for the summer, 2001 season," Hillside was compelled to comply with the City's demands. (Def.'s Ex. B, ¶ 23.)

On June 7, 2001, the opening day of the season, Duchane advised the Mayor and the City Council that the City would perform daily inspections at Hillside with its own noise meter, make unannounced spot inspections, and use the police to shut the facility down at 11:00 p.m. (Def.'s Ex. L.) Moreover, the City's planning and zoning staff were to perform a site review to determine if all the SALU conditions were being met. (*Id.*)

---

hearing that the Commission would not be able to subsequently change the 100 decibel level. (Def.'s Ex. G-2.)

3

On June 8, 2001, the City's Community Development Director monitored the sound at Hillside and recorded an average sound of 91 to 93 decibels with a single spike over 100 decibels.  (Def.'s Ex. M.)

On June 12, 2001, just five days after the beginning of the 2001 concert season, Duchane informed Hillside that he would conduct an Administrative Enforcement Hearing ("AEH") to hear evidence as to whether Hillside constituted a nuisance, and that he would use the information obtained from the hearing to determine "the advisability of recommending various formal actions, *such as reconsideration of the Special Land Use*." (emphasis added)  (Def.'s Ex. N.)

During the June 20, 2001 AEH, the City Attorney advised that the Planning Commission was the governing body that had the authority to consider whether Hillside was in breach or in compliance with the conditions of the SALU.  (Def.'s Ex. O.)  At the end of the AEH, Duchane took the matter under advisement.  (*Id.*)

After the AEH, in a June 27, 2001 legal opinion, the City Attorney advised that the Planning Commission could not unilaterally amend the conditions of the SALU.  (Def.'s Ex. P.)  The opinion further advised that the City could only terminate or revoke the SALU in circumstances where Hillside had failed to meet reasonable and clearly stated conditions within the SALU.  (*Id.*)

On July 17, 2001, the City Council approved a motion directing the City Attorney to outline possible legal actions regarding Hillside's Freedom Hill Amphitheater.  On August 7, 2001, the City's attorney issued an opinion advising the City Council of the following options:  (1) issue noise violations punishable as a misdemeanor, (2) classify Hillside as a public nuisance, (3) terminate the SALU, or (4) adopt a new noise ordinance.  (Def.'s Ex.

4

Q.)

### Underlying State Action

On August 6, 2001, Hillside filed a State Action against the City and Duchane in Macomb County Circuit Court, seeking damages in excess of $14 million, and asserting claims for: (1) superintending control, (2) declaratory judgment, (3) denial of substantive and procedural due process, (4) business libel and slander, and (5) anticipatory breach/detrimental reliance.

In support of its purported cause of action for superintending control, Hillside alleged that the City's ordinances did not provide for the Administrative Enforcement Hearing (AEH) held on June 20, 2001, that the proper procedure under the City's ordinances was a municipal civil infraction hearing, that Hillside had presented evidence at the June 20, 2001 hearing demonstrating its compliance with all City ordinances and all SALU conditions, and that Duchane had not yet issued any decision. (Def.'s Ex. B, Compl. ¶¶ 26-31, 36, 40, 46.)

As to its request for a declaratory judgment, Hillside alleged that the City's actions were "arbitrary and capricious and without any interest basis" and sought a declaration of Hillside's rights, a finding of "bad faith" against the City, and a permanent injunction against the City's further interference from Hillside's rights under the SALU. (*Id.* at ¶ 49, Count II, Prayer for Relief.)

As to Hillside's third claim, Hillside alleged that the Official Notice of the hearing and the AEH violated its procedural due process rights under the Michigan Constitution, and requested that the City's actions be declared unreasonable and that it be permanently enjoined from denying Hillside's rights and pay its costs and attorneys' fees. (*Id.* at ¶ 52, Count III, Prayer for Relief.)

5

As to its libel and slander per se claims, Hillside requested money damages resulting from oral and written statements it alleged the City made to third parties.  (*Id.* at ¶ 58.)

Finally, in Count V, Hillside alleged that the SALU constituted an agreement between the City and Hillside, that Hillside relied upon this agreement to continue construction of the amphitheater, and the City's attempts to enforce general municipal ordinances to close the amphitheater were in the nature of an anticipatory breach of the parties' agreement.  (*Id.* at ¶¶ 61-62, 66.)

On August 7, 2001, the state court ordered Duchane to render a decision on the nuisance issue within seven days.  (Def.'s Ex. R.)

On August 15, 2001, Duchane issued a Memorandum of Determination, finding that the noise from Hillside was a nuisance in violation of the City's ordinances.  (Def.'s Ex. S.)

Less than three weeks later, Hillside filed an amended complaint in the State Action, adding the allegation that Duchane's August 15, 2001 decision was not based on competent material or substantial evidence and thus was not justified.  (Def.'s Ex. T at ¶¶ 43, 45.)  Hillside's amended complaint also added the following five claims:  breach of contract (Count VI), breach of an implied covenant (Count VII), fraudulent misrepresentation (Fraud in the Inducement) (Count VIII), negligent misrepresentation (Count IX), silent fraud (Count X), breach of an implied covenant of good faith and fair dealing (Count XI), and tortious interference with contractual relationships and/or advantageous business expectations (Count XII).

On January 16, 2002, Hillside filed a second amended complaint in the State Action, adding an allegation that on October 16, 2001, the City Council adopted a resolution affirming Duchane's Memorandum of Determination and consolidating Hillside's separate

6

state court action appealing the decision with the pending State Action.  (Def.'s Ex. U, ¶ 52, 53.)

### The Guardian Angels Action

On June 4, 2002, Hillside and three charitable organizations, including the Guardian Angels Catholic School ("Guardian Angels Plaintiffs"), filed an action in federal court ("Guardian Angels Action") against the City based on the City's failure to approve special licenses for the sale of alcohol at the amphitheater.  The complaint alleged the following claims:  (1) violation of 42 U.S.C. § 1983 for denial of plaintiffs' federal rights guaranteed under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution (Count I); (2) violation of 42 U.S.C. § 1986 (Count II);  and (3) direct constitutional claims for violation of plaintiffs' due process, equal protection and First Amendment rights (Counts III, IV, and V).  (Def.'s Ex. V.)  The complaint was amended the following day, adding a claim for a violation of 42 U.S.C. § 1985(3) (Count VI).  (Def.'s Ex. W.)  This Action alleged the City wrongfully refused to grant Hillside special one day liquor licenses to sell and serve alcohol at the amphitheater and sought injunctive relief.  It alleged a pattern and practice of harassing conduct, allegedly as retaliation for Hillside's filing of the State Action.  (*Id.*)

On June 18, 2002, this Court heard a motion for preliminary injunction and mediated a resolution.  As part of the resolution, the Guardian Angels plaintiffs agreed to dismiss their case against the City without prejudice.  As the Court observed, this did not preclude plaintiffs from refiling a suit against the City.

On June 21, 2002, three days after the Guardian Angels Action was settled, the court in the State Action declared that the City may not enforce its noise ordinance against

Hillside when Hillside complies with the terms of the SALU.  (Def.'s Ex. X.)

On September 10, 2002, Hillside filed another suit in federal court.

**Federal Action**

On September 10, 2002, the Hillside Plaintiffs and Roncelli, Inc. filed another lawsuit in federal court ("Federal Action") against the same defendants named in the Guardian Angels Action.  (Def.'s Ex. Y.)  On September 24, 2002, an amended complaint for damages and injunctive relief was filed.  (Def.'s Ex. Z.)  The amended complaint asserted violations of:  (1) 42 U.S.C. § 1983 (for procedural and substantive due process violations and equal protection violations); (2) 42 U.S.C. § 1985(3); (3) 42 U.S.C. § 1986; (4) Constitutional rights to due process and equal protection; (5) Constitutional first amendment rights; and (5) 18 U.S.C. §§ 1961, 1962 (RICO) (against Duchane and the O'Reilly Defendants).

The amended complaint also alleged that the City and other defendants "made it clear that they intend to punish Hillside, and any others whom they believe [were] affiliated with Hillside, for filing the state court lawsuit and for insisting on their rights under the grant of the [SALU]."  (*Id.* at ¶ 54.) Alleged evidence of the City's intent included its issuance of three criminal noise violations, six criminal zoning violations, refusals to issue various permits, and excessive police presence during amphitheater events.  (*Id.*)

The amended complaint in the Federal Action also alleged that the City:  (1) refused to rule on Hillside's application for the transfer of a liquor license, (2) refused to grant Special Licenses for the sale of alcoholic beverages at the amphitheater, and (3) improperly cited "health and sanitation" reasons for the Special License denials.  (*Id.* at ¶¶ 57-65.)  The allegations in the Federal Action pick up where the Guardian Angels Action left off, alleging

8

that the Insureds continued their pattern of unlawful harassment.  It includes allegations about the State Action and the fact that an order had been entered in that State Action estopping Insureds from enforcing the noise ordinance against Hillside when Hillside is operating consistent with the SALU.  (*Id.* at ¶ 67.)  It alleges that Insureds escalated their harassment of Hillside upon receipt of this order by:  using the "C-weighted" scale to measure decibels and thus skew the sound results to aid their effort to revoke Hillside's SALU; billing Hillside for "services" in contravention of the State Action order; threatening to revoke the SALU; turning off the water supply to the amphitheater shortly before a concert; refusing to process an application for a haunted house; and refusing to process Hillside's liquor license application.  (*Id.* at ¶¶ 68-70.)

Roncelli Inc., a corporate plaintiff in the Federal Action, was not a plaintiff in the State or Guardian Angels Actions.  In the Federal Action, Roncelli Inc. alleged for the first time that Insureds had violated its civil and constitutional rights, causing harm to its reputation and causing it to lose a construction contract with the Detroit News worth "well over $200 million."  (Riberas Dep. at 32-35, 139; Wickersham Dep. at 152-53, 156-58.)

On March 22, 2004, the Hillside Plaintiffs, Roncelli Inc., and Insureds settled the State and Federal Actions for $31 million.  (Pls.' Ex. I.)

**Coverage Action**

On February 21, 2003, Insureds provided notice of the State and second Federal Action to Specialty National, requesting that Specialty National defend and indemnify them. On July 15, 2003, Specialty National responded that it would participate in the defense of Insureds in the underlying State and Federal Actions under a reservations of rights.

On July 18, 2003, Insureds filed this coverage action against Specialty National and

9

various other insurers.

On February 11, 2004, this Court granted in part and denied in part Insureds' motion for partial summary judgment as to its claims against Specialty National.  It granted the motion in part, holding that Specialty National owed Insureds a duty to defend, and denied the motion in part, concluding that questions of fact existed regarding Specialty National's indemnity coverage.  (2/14/04 Order at 9, 20-26.)

On June 30, 2004, Insureds filed an amended complaint, alleging an additional claim that Defendant Insurers breached an implied covenant of good faith and fair dealing.  (Pls.' Ex. GG.)

On June 30, 2004, Specialty National filed a counterclaim seeking a declaration that the insurance policy is rescinded (Count I), and seeking damages in connection with Insureds' application for insurance under claims of negligent misrepresentation (Count II), intentional misrepresentation (Count III), and fraudulent concealment (Count IV).  (Pls. Ex. HH.)

## II.    Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

10

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

**III.    Analysis**

**A. Michigan Contract Construction Principles**

The rules of construction for insurance contracts are the same as those for any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). The court must first determine whether the contract language at issue is ambiguous. That question is one of law for the court. *Mayer v. Auto-Owners Ins. Co.*, 338 N.W.2d 407, 409 (Mich. Ct. App. 1983). Construction of a contract, whether it is ambiguous or unambiguous, likewise presents a question of law for the court. *Fragner v. American Community Mut. Ins. Co.*, 502 N.W.2d 350, 352 (Mich. Ct. App. 1993). The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992).

11

A contract which admits of but one interpretation is unambiguous.  *Fragner*, 502 N.W.2d at 352.  In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable.  *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).

If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.*, 505 N.W.2d 553, 557 (Mich. 1993),  without looking to extrinsic evidence.  *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 396 n. 6 (Mich. 1991).  It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction.  *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989).

If the contract is ambiguous, the court must determine the intent of the parties.  To do so, the court may look to extrinsic evidence such as custom and usage.  *Michigan Millers Mut. Ins. Co v. Bronson Plating Co.*, 496 N.W.2d 373, 379 (Mich. Ct. App. 1992), *aff'd*, 519 N.W.2d 864 (Mich. 1994).    "Perhaps the most common of extrinsic aids to the construction of an insurance policy or other contract  is usage and custom."  *Allstate Ins. Co v. Freeman*, 443 N.W.2d 734, 760 (Mich. 1989) (Boyle, J.).

In addition, certain rules of construction apply.  Ambiguous terms in an insurance policy are construed in favor of the insured.  *Arco Indus. Corp. v. Am. Motorists Ins.*, 531 N.W.2d 168, 172 (Mich. 1995).  *Accord Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 786-87 (Mich. 2003) (holding that "[t]he rule of reasonable expectations clearly has no application to unambiguous contracts.  That is, one's alleged 'reasonable expectations' cannot supersede the clear language of a contract. . . . [Moreover], if a contract is ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract

12

should be interpreted against the insurer. In other words, when its application is limited to ambiguous contracts, the rule of reasonable expectations is just a surrogate for the rule of construing against the drafter.").

It is the insurer's responsibility to clearly express limits on coverage. *Auto Club Ins. Ass'n v. DeLaGarza*, 444 N.W.2d 803, 806 (Mich. 1989). Thus, insurance exclusion clauses are construed strictly and narrowly. *Auto-Owners v. Churchman*, 489 N.W.2d at 435; *Farm Bureau Mut. Ins. Co. v. Stark*, 468 N.W.2d 498, 501 (Mich. 1991).

### B. Cross-Motions

This matter is presently before the Court on Insureds' and Specialty National's cross-motions for partial summary judgment. The Court addresses Insureds' motion first.

### 1. Insureds' Motion for Summary Judgment

Insureds' motion argues that Specialty National: (1) breached its duty to defend by failing to actively participate in settlement negotiations; (2) owes it a duty to indemnify Insureds for the Hillside Plaintiffs § 1983 claims and the Roncelli Inc. claims asserted in the Federal Action under its GL, PLO, and Umbrella coverage; and (3) waived its right to seek rescission and failed to establish the essential elements of its remaining counterclaims thus entitling Insureds to summary judgment on these counterclaims. Insureds' motion is DENIED IN PART and GRANTED IN PART.

### a. Breach of Duty to Defend

This Court begins its analysis with the Insureds' argument that they are entitled to summary judgment on the issue whether Specialty National breached its duty to defend by failing to actively participate in settlement negotiations. Because questions of material fact

13

exist on this issue, summary judgment is precluded on this issue.

**b. Duty to Indemnify - Known Loss Doctrine**

Insureds argue that there are no disputed issues of material fact precluding summary judgment on the issue of Specialty National's duty to indemnify them for damages relating to the Hillside Plaintiffs § 1983 claims and the Roncelli Inc. claims asserted in the Federal Action filed on September 10, 2002. Specialty National responds that the known loss doctrine, which applies to the GL, POL, and Umbrella coverage parts of its policy and which this Court has held is recognized by Michigan law (2/11/04 Opin. at 21-23), precludes summary judgment on this indemnity issue. This Court agrees that questions of fact remain as to the Hillside Plaintiffs § 1983 claims but disagrees that any remain as to the Roncelli Inc. claims.

**(1)    Hillside Plaintiffs § 1983 Claims**

As previously observed, the known loss doctrine is judged using a subjective standard; i.e., whether "the insured was aware of an immediate threat of injury for which it was ultimately held responsible and for which it now seeks coverage, not the insured's awareness of its legal liability for that injury." (*Id.* at 21.) Despite Insureds' arguments to the contrary, questions of material fact exist on whether this doctrine applies to exclude coverage of the Hillside Plaintiffs § 1983 claims. (Specialty National Resp. at 4-15.) As to the § 1983 claims, Specialty National presents evidence involving the State and Guardian Angels' Actions that calls into question whether Insureds were aware, prior to September 1, 2002, of an immediate threat of the Hillside Plaintiffs § 1983 injuries for which Insureds were ultimately held responsible and for which they now seek coverage. (*Id.*)

14

(2)    **Roncelli Inc. Claims**

As to the Roncelli Inc. claims, Specialty National presents a single piece of evidence to support its argument that an issue of fact exists as to whether, prior to the inception date of its policy, Insureds had knowledge of circumstances that put them on notice of an immediate threat of the Roncelli Inc. injuries for which they were ultimately held responsible and for which they now seek coverage.  That single piece of evidence is a July 26, 2001 letter authored by Charles Turnbull of the O'Reilly, Rancilio law firm, advising Mr. Roncelli of a potential conflict because of the dispute between the City and the Freedom Hill Amphitheater.  It states that:

> Because the advice we gave to the City could result in the City taking action which would adversely affect the economic interest of you and Hillside Productions at Freedom Hill Amphitheater including the revocation of the special use approval, abatement of the nuisance, potential closing of the ampitheater, we are requesting your consent to continue to represent the City of Sterling Heights in this matter even though our representation would be adverse to your and Hillside Production interests in the amphitheater.

(Ex. A to Specialty Nat'l Resp. to GenStar's Mot., 7/26/01 letter.)

The only information contained in this letter relates to Mr. Roncelli's interest in Hillside Productions at the Freedom Hill Amphitheater.  There is no suggestion or implication that the dispute between the City and Freedom Hill might adversely affect the interest of the separate legal entity Roncelli Inc. relative to commercial ventures not involving Freedom Hill; i.e., the Detroit News construction project.  Accordingly, no question of fact exists on this issue.  The known loss doctrine does not operate to exclude coverage of the Roncelli Inc. Federal Action claims.

**c.  Specialty National's Counterclaim**

Insureds also seek summary judgment on Specialty National's counterclaim seeking

15

rescission and asserting claims of negligent misrepresentation, intentional misrepresentation, and fraudulent concealment. Insureds' argue that Specialty National waived its rescission claim and has failed to present any evidence to support its remaining claims concerning material misrepresentations or fraud. Specialty National responds that it is now abandoning its counterclaim for rescission. It does not present any argument or evidence in support of its remaining counterclaims. Accordingly, Insureds' motion for summary judgment as to all claims asserted in Specialty National's counterclaim is granted.

### 2. Specialty National's Motion

Specialty National's motion argues that: (1) Michigan law does not recognize a tort claim for bad faith breach of an insurance contract; (2) Insureds cannot obtain legal fees incurred in this suit as damages for any breach of an implied covenant of good faith and fair dealing; (3) a deemer clause in the Umbrella policy provisions precludes Umbrella coverage for the Hillside Plaintiffs § 1983 and the Roncelli Inc. claims asserted in the Federal Action; and (4) POL coverage is precluded under breach of contract and known loss exclusions.[2] Specialty National's motion is GRANTED IN PART and DENIED IN PART.

### a. Breach of Implied Covenant of Good Faith and Fair Dealing

Despite Specialty National's arguments to the contrary, Insureds' amended complaint does not allege a tort claim. Rather, it alleges a contract claim for breach of an implied covenant of good faith and fair dealing. In particular, Insureds allege that Specialty

---

[2]Specialty National also raises allocation issues which will not be addressed until after there is a determination concerning which insurance companies owe a duty to indemnify. (Def.'s Br. at 15-20.) Accordingly, Specialty National's motion as to these allocation issues is denied as premature.

National breached that implied contractual covenant by failing to properly investigate its claims before initially denying coverage and by subsequently "abandoning" Insureds during settlement negotiations.  (Pls.' Ex. GG, ¶¶ 56-63, ¶¶ 88-96 (Count III).)

Michigan law does recognize an implied contractual duty on the part of the insurer to act in good faith when investigating an insurance claim and when negotiating a settlement so that it falls within policy limits.  *Aetna Casualty & Surety Co. v. Dow Chemical Co.*, 883 F. Supp. 1101, 1111 (E.D. Mich. 1995) (citing Michigan cases).  Michigan law, however, does not allow the recovery of attorneys' fees as damages for the breach of an implied covenant of good faith in an insurance contract.  *Burnside v. State Farm Fire & Cas. Co.*, 528 N.W.2d 749 (Mich. Ct. App. 1995).  Rejecting a contrary decision by the Sixth Circuit, the Michigan Court of Appeals in *Burnside* held that the American rule applies and thus precludes the ability to recover attorneys' fees as an element of damages on such claims. *Id.* at 753 (rejecting *Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273 (6th Cir. 1985)).  This Court predicts that the Michigan Supreme Court will reach a similar conclusion. Accordingly, Specialty National's motion is denied as to Insureds' ability to pursue a contract claim for breach of an implied covenant of good faith and fair dealing, but granted as to the issue whether Insureds can recover attorneys' fees incurred in this coverage action as an element of their damages.  They cannot.

**b.  Umbrella Policy**

Specialty National next argues that a deemer clause in a "Known Injury or Damage" endorsement to its Umbrella policy amends the insuring agreement and provides that if an Insured knew that "Bodily Injury," "Property Damage" or "Personal and Advertising Injury" occurred before the September 1, 2002 policy inception date, then any continuation,

17

change or resumption of such injury or property damage occurring during and after the policy period will be deemed to have been known prior to the policy period.   Specialty National further argues that this deemer clause applies to preclude Umbrella coverage for any of Insureds' underlying claims.  Insureds respond that the endorsement amends Umbrella coverage as to general commercial liability but not as to public officials' liability, and further responds that questions of fact exist precluding summary judgment as to Umbrella coverage.

**(1)      Umbrella (Excess) Coverage - GL (Primary) Coverage**

The Known Injury or Damage endorsement amends the insuring agreement contained in the Umbrella policy by limiting coverage as follows:

A. We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage or Personal and Advertising Injury** to which this insurance applies.

The insurance applies to **Bodily Injury, Property Damage** or **Personal and Advertising Injury** only if:

1. The **Bodily Injury, Property Damage** or **Personal and Advertising Injury** takes place during the Policy Period;

2. The **Bodily Injury, Property Damage** or **Personal and Advertising Injury** is caused by an Occurrence anywhere in the world; and

3. Prior to the Policy Period, no Insured knew that the **Bodily Injury, Property Damage** or **Personal and Advertising Injury** had occurred, in whole or in part.  If an Insured knew, prior to the Policy Period, that the **Bodily Injury, Property Damage** or **Personal and Advertising Injury** occurred, *then any continuation, change or resumption of such* **Bodily Injury, Property Damage** *or* **Personal and Advertising Injury** *during and after the Policy Period will be deemed to have been known prior to the Policy Period.*

18

\* \* \*

C.  **Bodily Injury, Property Damage** or **Personal and Advertising Injury** *will
be deemed to have been known to have occurred at the earliest time when*
any **Insured**:

1.  Reports all, or any part, of the **Bodily Injury, Property Damage** or
    **Personal and Advertising Injury** to us *or any other insurer*;

2.  Receives a written or verbal demand or claim for damages because
    of the **Bodily Injury, Property Damage** or **Personal and
    Advertising Injury**; or

3.  Becomes aware by any other means that **Bodily Injury, Property
    Damage** or **Personal and Advertising Injury** has occurred or has
    begun to occur.

(Def.'s Mot., Ex. A, Known Injury or Damage Endorsement to Commercial Umbrella

Coverage at p. 1 of 2.) (emphasis added).

Thus, under subparagraphs C(1) and (2) of this Endorsement, all claims for Bodily

Injury, Property Damage or Personal and Advertising Injury (as defined in the Umbrella

policy) that were first received by Insureds before the September 1, 2002 policy inception

date and all such claims that were reported to other insurance carriers before September

1, 2002 are not covered under the Umbrella policy.

Also, under subparagraph A(3), if Insureds knew, before September 1, 2002, that the

claimed bodily injury, property damage or personal and advertising injury had occurred in

whole or in part, then any continuation, change or resumption of such injury during the

policy period is *deemed* to have been known prior to the policy period and excluded under

subparagraph C(3).

There is no dispute that these provisions preclude Umbrella coverage for claims for

bodily injury, property damage, or personal and advertising injury that were first made

19

against Insureds in the State and Guardian Angels' Actions and reported to other insurers before September 1, 2002.  The dispute here centers on Umbrella coverage for allegedly "new" claims asserted in the September 10, 2002 Federal Action.

**(a)    SALU-Related "Personal Injury"**

Specialty National correctly observes that "Personal Injury" is defined differently in the Umbrella policy than in the GL policy and does not include the § 1983 claims.  Insureds do not dispute this.  Accordingly, all § 1983 claims asserted in the Federal Action fall outside the coverage provisions of Specialty National's Umbrella policy for GL coverage.

Moreover, even if Insureds show that the SALU-related claims otherwise fall within the Umbrella policy definition of "Personal Injury,"[3] Insureds cannot avoid the fact that they first reported part of any such injury to other insurers, GenStar and United National, on August 9, 2001 when it notified them of the underlying State Action with its allegations that the City was interfering with and attempting to negate the Hillside Plaintiffs' rights under the SALU.  Under ¶ I.C.1 of the Known Injury endorsement, Insureds are deemed to know that this injury occurred on August 9, 2001; a date that precedes the September 1, 2002 inception date of Specialty National's Umbrella policy and thus precludes Umbrella coverage.

Furthermore, under ¶ I.A.3 of that Known Injury endorsement, any continuation, change or resumption of such "Personal Injury" that occurs during the policy period is deemed to have been known prior to the policy period.  Because the City's "formal" SALU

---

[3]The Umbrella policy defines "Personal Injury" as "injury, including consequential Bodily Injury, arising out of," among other things, discrimination and disparagement. (Umbrella Policy, § IV.K.5-6.)

revocation proceedings constitute a continuation, change, or resumption of its earlier attempts to interfere with and negate Hillside's rights under the SALU, any claims for personal injuries arising out of those formal proceedings are deemed to have occurred before Specialty National's policy period and thus there is no excess GL coverage available under Specialty National's Umbrella policy.

(b)    Liquor License-Related "Personal Injury"

The same analysis would apply to exclude any claims for a covered "Personal Injury" connected to Insureds' attempts to interfere with the Hillside Plaintiffs' ability to obtain liquor licenses.   Applying the plain language of the Known Injury endorsement, Insureds are deemed to have known of any such injury in June of 2002 when the Guardian Angels Action was filed.   Claims arising out of the Insureds' failure to act on Hillside liquor licenses and the effect of that conduct on Hillside's business were asserted in the Guardian Angels Action, and that Action was filed before the September 1, 2002 inception date of Specialty National's Umbrella policy.

More importantly, however, claims arising out of Insureds' failure to act upon and/or denial of liquor license applications do not satisfy any of the Umbrella policy's definitions of "Bodily Injury,"[4] "Property Damage,"[5] or "Personal and Advertising Injury."[6]  Insureds do

---

[4]"Bodily Injury" is defined in the Umbrella policy as "bodily injury, sickness, disability or disease" including mental anguish directly resulting therefrom.  (Umbrella Policy, § IV.B.)

[5]The Umbrella policy defines "Property Damage" as "physical injury to tangible property" or "loss of use of tangible property."  (Umbrella Policy, § IV.N.)  A liquor license is not tangible property.

[6]The definition of "Personal and Advertising Injury" in the Umbrella Policy does not include civil rights violations and does not include conduct that includes mismanagement of liquor license applications.  (Umbrella Policy, § IV.K.)

not argue otherwise.

**(c)     Roncelli Inc.-Related Personal Injury**

Application of the Umbrella policy's Known Injury endorsement would not exclude any claims for covered "Personal Injury" connected to the Roncelli Inc. claims, which were first asserted in the Federal Action.   Nonetheless, before determining that there is Umbrella coverage for such claims, Insureds must show that the Roncelli Inc. claims satisfy the Umbrella policy's definitions of "Bodily Injury," "Property Damage," or "Personal and Advertising Injury.  Insureds have not met this burden.

Insureds argue that the Umbrella policy definition of "Personal Injury" is satisfied because the Roncelli Inc. claims allege an injury for "invasion of the right of private occupancy." This Court previously rejected this argument in its February 11, 2004 Opinion. (2/11/04 Opin. at 31.)  There are no allegations in the underlying Federal Action complaint that Insureds wrongfully entered any Roncelli Inc. property or evicted Roncelli Inc. from that property.   In fact, the underlying allegations in the Federal Action acknowledge that the Hillside Plaintiffs have a landlord/tenant relationship with Macomb County, not the Insureds. Accordingly, there is no excess GL coverage available under Specialty National's Umbrella policy for the Roncelli Inc. claims.

**(2)     Umbrella (Excess) Coverage - POL (Primary) Coverage**

This Court agrees with Insureds that the Known Injury or Damage endorsement amends Umbrella coverage for underlying GL coverage but not POL coverage.  The underlying POL policy has its own known loss exclusion, and the Umbrella policy follows the form of that POL policy.  (POL Policy, Endorsement form POF 70a (5/99).)

The language in this Umbrella endorsement supports this conclusion.  It addresses

22

claims for Bodily Injury, Property Damage, and Personal and Advertising Injury.   The Insuring Agreement for underlying GL coverage uses these terms.   (Def.'s Mot., Ex. A, Public Entity General Liability Coverage Form, Coverage A, § I.1 at p. 1 of 15; Coverage B, § 1 at p. 5 of 15.)   The Insuring Agreement for underlying POL coverage does not. (Def.'s Mot., Ex. A, Public Officials Liability Insurance, § II, at p. 3 of 11.)   Rather than agreeing to pay sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," or "personal and advertising injury," the POL policy agrees to pay "all LOSS that the INSURED shall be legally obligated to pay resulting from a WRONGFUL ACT but only with respect to CLAIMS first made against the INSURED during the POLICY PERIOD." (*Id.*)   There is no use of this POL language in the Known Loss endorsement to Umbrella coverage.

Moreover, as Insureds note, the Umbrella policy contains a "Public Officials Errors & Omissions Following Form Endorsement."   Thus, claims covered by the underlying POL policy are also covered by the Umbrella policy.   As observed above, the underlying POL policy has its own known loss exclusion.   Therefore, since the Umbrella policy follows the form of that underlying POL coverage, an additional known loss exclusion would be redundant.

This "Following Form" endorsement also contains an exception (second paragraph) to an exclusion (first paragraph).   Specialty National concedes that the exception is limited to liability that is covered by underlying insurance; i.e., POL insurance.   Specialty National's argument that the endorsement means "coverage under the Umbrella form shall not be broader than that under the POL form" does nothing to negate Insureds' argument that the "Known Loss" endorsement applies only to underlying GL coverage.   (Def.'s Reply at 4, 5

23

n.1.)

Specialty National further argues that, because the Umbrella policy follows the form of the POL policy, it is bound by the POL coverage form's definition of a "claim" which includes an insureds' "knowledge of circumstances that could reasonably be expected to give rise to" a written demand for damages.   (Def.'s Mot., Ex. A, POL policy, § 1, Definitions, p. 1 of 11.)  Specialty National then argues that, because Insureds had been sued previously for failing to issue liquor licenses and for a *de facto* revocation of the SALU, Insureds would reasonably expect that the continued failure to issue liquor licenses and the use of a "formal" process to revoke the SALU would give rise to a demand for damages. (Def.'s Reply at 5 n.1.)  This Court disagrees.

As to the Hillside Plaintiffs § 1983 claims, questions of fact exist as to Insureds' reasonable expectations of a written demand for damages for the § 1983 claims asserted in the Federal Action.  Accordingly, Specialty National is not entitled to summary judgment on its duty to indemnify under either the primary or the excess POL coverage parts of its policy with Insureds for these claims.

As to the Roncelli Inc. claims asserted in the Federal Action, Specialty National is likewise not entitled to summary judgment in its favor on the duty to indemnify, but for a different reason.  The only evidence Specialty National presents to show that Insureds had knowledge of circumstances that could reasonably be expected to give rise to a written demand for damages in connection with Roncelli Inc. is the July 26, 2001 letter discussed *infra* at pp. 15-16.  There is no suggestion or inference in that letter to Mr. Roncelli that the dispute between the City and Freedom Hill may adversely affect the Roncelli Inc.'s commercial ventures not involving Freedom Hill; i.e., the Detroit News construction project.

24

Specialty National's arguments to the contrary are rejected.[7]

### c. POL Coverage

Specialty National next argues that two provisions in the POL policy preclude coverage to Insureds for the § 1983 and Roncelli Inc. claims asserted in the Federal Action: (1) a known loss exclusion;[8] and (2) a breach of contract exclusion.

### a. Known Loss Exclusion

As to the known loss exclusion, Specialty National focuses on language providing that there is no POL coverage for CLAIMS against the INSURED arising out of:

> Any **LOSS** for which the **INSURED** is entitled to indemnity or payment by reason of having given notice of any circumstances that might give rise to a **CLAIM** under any other policy or policies.

(POL Policy, Endorsement form POF 70a (5/99).)   Specialty National argues that this means that there is no POL coverage for losses for which the Insureds gave notice to other

---

[7]This same reasoning and result apply to Specialty National's arguments with regard to primary coverage under its POL policy.

[8]An endorsement titled "Exclusion - Knowledge of Wrongful Acts Prior to the Policy Period" changes the POL policy and provides as follows:

> This insurance does not apply to and WE shall not be obligated to make any payment or to defend any SUIT in connection with any CLAIM or SUIT made against the INSURED arising out of:

> 1.      Any WRONGFUL ACT(S) that takes place prior to the POLICY PERIOD if the INSURED had knowledge of circumstances which could reasonably be expected to give rise to a CLAIM; or

> 2.      Any LOSS for which the INSURED is entitled to indemnity or payment by reason of having been given notice of any circumstances that might give rise to a CLAIM under any other policy or policies.

(POL Policy, Endorsement form POF 70a (5/99).)

25

insurers; i.e., those arising from claims made in the State or Guardian Angels Actions. Insureds do not dispute this.  They do dispute Specialty National's more expanded reading of this exclusion – that claims in those earlier Actions are the same as the Hillside Plaintiffs § 1983 claims and the Roncelli Inc. claims asserted in the Federal Action.  For the reasons discussed above, questions of fact exist precluding summary judgment as to the Hillside Plaintiffs § 1983 claims asserted in the Federal Action.  The same is not true for the Roncelli Inc. claims.

There are no Roncelli Inc. claims in the State or Guardian Angels Actions.  Moreover, Specialty National presents no evidence that Insureds gave notice to other insurers of "circumstances that might give rise" to the Roncelli Inc. claims asserted for the first time in that Federal Action.  Finally, as disclosed in the Specialty National Disclosure Form (Form POF 24a (5/99)) attached to its claims-made POL policy, "[i]f there is no Retroactive Date on the policy, the policy will respond only to claims first made and reported during the policy period of covered claims, *no matter when the acts occurred.  But if previous insurance also applies to the claims, your 'claims-made' policy will be excess – that is, it will apply only after that previous insurance is used up."*  (Pls.' Mot., Ex. E, Specialty National Policy, Disclosure Form POF 24a (5/99) at p. 2 of 2.) (emphasis added).  It is not disputed that there is no retroactive date on Specialty National's POL policy.  (*Id.* at POF 1b (5/99).)  Thus, Specialty National's arguments for summary judgment fail as to these Roncelli Inc. claims.

### b.  Breach of Contract Exclusion

Specialty National also argues that POL coverage is excluded under a breach of contract exclusion providing that:

This insurance does not apply to and **WE** shall not be obligated either to make any payment or to defend any **SUIT** in connection with any **CLAIM** or **SUIT** made against the **INSURED**:

* * *

12. For any **LOSS** arising as a consequence of the failure, refusal, or inability of the **INSURED** to enter into, renew or perform any oral, written or implied contract or agreement between the **INSURED** and any other person, except any oral, written or implied **EMPLOYMENT CONTRACT**

(Specialty National POL policy, § III, Exclusions, ¶ 12.)  Specialty National asserts that, because the SALU is either an express or implied contract or agreement, any loss arising from the breach thereof is excluded under its POL policy.  This Court disagrees.

The essence of the Hillside Plaintiffs' § 1983 claims is that the SALU created constitutionally protected property rights, not contract rights.[9]  This Court's decisions in the Federal Action concerning the Hillside Plaintiffs' § 1983 claims recognize that the SALU created constitutionally protected property rights, not contract rights.  These constitutionally-protected property rights are inherently different than mere contractual rights.  Specialty National's arguments here ignore the nature of the § 1983 claims asserted in the Federal Action, the nature of the rights created by the SALU, and the damages that flow from a violation of those rights in an attempt to shoe-horn those § 1983 claims into a breach of contract exclusion.  Specialty National's attempt is rejected.  The breach of contract exclusion in its POL policy does not apply to preclude coverage for the SALU-related § 1983 claims asserted in the Federal Action.

**IV.   Conclusion**

---

[9]Unlike the State Action, there are no breach of contract claims asserted in the Federal Action.

For the above-stated reasons, the Plaintiffs' and Defendant Specialty National's cross-motions for partial summary judgment are GRANTED IN PART and DENIED IN PART.

Plaintiffs' motion is GRANTED as to all claims asserted in Specialty National's counterclaim.

Specialty National's motion is DENIED as to Insureds' ability to pursue a contract claim for breach of an implied covenant of good faith and fair dealing but GRANTED as to the issue whether Insureds can recover attorneys' fees incurred in this coverage action as an element of damages.

As to Specialty National's duty to defend, questions of fact exist to preclude summary judgment on the issue of Specialty National's breach of that duty by failing to actively participate in settlement negotiations.

As to Specialty National's duty to indemnify:

A.  Under its GL and POL policies:

    1.  Questions of fact exist to preclude summary judgment as to the Hillside Plaintiffs § 1983 claims asserted in the Federal Action;

    2.  No questions of fact exist and Plaintiffs' motion is GRANTED as to the Roncelli Inc. claims asserted in the Federal Action.

B.  Under its Umbrella policy:

    1.  Questions of fact exist to preclude summary judgment as to Umbrella POL coverage for the Hillside Plaintiffs § 1983 claims asserted in the Federal Action;

2. No questions of fact exist and Specialty National's motion is GRANTED as to Umbrella GL coverage for the Hillside Plaintiffs § 1983 claims asserted in the Federal Action;

3. No questions of fact exist and Plaintiffs' motion is GRANTED as to Umbrella POL coverage for the Roncelli Inc. claims asserted in the Federal Action.

4. Plaintiffs have not shown that Roncelli Inc. claims fall within Umbrella policy definitions for personal injury or property damage and thus Specialty National's motion is GRANTED as to Umbrella GL coverage for the Roncelli Inc. claims asserted in the Federal Action.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 27, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager