UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF STERLING HEIGHTS, ET AL.,

      Plaintiffs,

v.

UNITED NATIONAL INSURANCE
COMPANY,

      Defendant.

_____/

Case No. 03-72773

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT REGARDING DEFENSE COSTS,
CONSEQUENTIAL DAMAGES, AND PREJUDGMENT INTEREST [395, 565, 572,
598, 600]**

This insurance dispute comes before the Court on its request that Plaintiffs
("Insureds") and Defendant United National Insurance Company ("United") brief the
unresolved issues raised in Insureds' motion for summary judgment [395]: (1) defense
costs to be paid by United; (2) consequential damages for United's breach of its insurance
contract with Plaintiffs; and (3) prejudgment interest. For the reasons stated below, this
Court GRANTS IN PART and DENIES IN PART Insureds' motion.

## I. Background Facts

The Court is familiar with the facts and issues presented in this coverage action as
well as the underlying State and Federal Actions, having presided over the underlying
Federal Action and having addressed a number of coverage issues in this matter in

previous opinions and orders.  The background and procedural facts relevant to the three outstanding issues are as follows.

The State Action was filed on August 6, 2001.  The Federal Action was filed a little over a year later, on September 10, 2002.  (1/27/06 Order at 4, 6.)

This Court has previously determined that coverage is triggered under policies issued by three separate insurance companies, one of whom is United, for three separate time periods:  September 1, 2000 to September 1, 2001; September 1, 2001 to September 1, 2002; and September 1, 2002 to May 12, 2003.  (1/27/06 Orders, Docket Nos. 308, 309, 310.)  United's comprehensive general liability ("CGL") primary and excess policies issued to Insureds cover the first two time periods.[1]  As to those United policies, this Court determined that United's duty to indemnify for defense costs and damages is triggered as a result of the slander/libel/defamation claims asserted in the underlying State Action. (1/27/06 Order, Docket No. 309.)  As to the § 1983 claims asserted in the State and Federal Actions, this Court held that the policies of two other insurance companies, General Star Indemnity Insurance Company ("GenStar") and Specialty National Insurance Company ("Specialty National"), were triggered.  The Court also held that GenStar and Specialty National had a duty to defend.  (1/27/06 Orders, Docket Nos. 308, 310; 2/11/04 Order, Docket No. 34.)

Before the Federal Action was filed, United and GenStar each agreed to be responsible for one-half of defense costs incurred in the State Action after satisfaction of

---

[1]United's triggered policies provide a total CGL indemnity limit of $39,800,000 ($900,000 per year in primary and $19,000,000 per year in excess coverage).

the $100,000 SIR.[2]  After the Federal Action was filed, United and GenStar also agreed to be responsible for one-half of defense costs incurred in both the State and Federal Actions. (Def.'s Ex. 19, United 4/1/03 letter at 9.)  Subsequently, United, GenStar, and Specialty National agreed to be responsible for one-third of defense costs incurred in the State Action and GenStar and Specialty National agreed to each pay one-half of the defense costs incurred in the Federal Action.  United did not agree to share defense costs in the Federal Action, and both GenStar and Specialty National reserved the right to pursue United. (Def.'s Ex. 20, 8/26/03 letter from GenStar's counsel.)

On March 22, 2004, Insureds and the Underlying Plaintiffs entered into a settlement agreement that disposed of the State and Federal Actions in their entirety.  The terms of the $31 million settlement did not contain any allocation of the total settlement amount among the various claims asserted in the State and Federal Actions.  Two of the three potentially liable insurance companies, GenStar and Specialty National, actively participated in the settlement negotiations and have subsequently settled with Insureds in this coverage action.[3]  Thus, the only remaining disputes in this coverage action are those between Insureds and United.

_____

[2]United and GenStar agreed to accept the first $100,000 in defense expenses from both the underlying State and Federal Actions as satisfaction of Insureds' $100,000 SIR obligations under their policies.  (Def.'s Ex. 17, Gallagher 10/16/02 letter; Ex. 18, Summit (TPA for GenStar policies) 10/3/02 letter; Ex. 19, United 4/1/03 letter at 9.)  They also agreed that after the $100,000 SIR, they would each pay one-half of the defense expenses incurred in the State Action.  (*Id.*)

[3]GenStar agreed to pay $10.25 million of the $31 million settlement, and Specialty National agreed to pay $8.5 million.

On January 19, 2007, this Court determined that the *pro rata* "time-on-the-risk" allocation method should be applied to the $31 million settlement of the underlying State and Federal Actions because the damages reflected in that global settlement were indivisible. (1/19/07 Order, Docket No. 354.) Under this allocation method, the Court found that United had an indemnity obligation for $10.33 million, or one-third of the $31 million settlement. (1/19/07 Order at 11, n.7.) The Court did not, at that time, determine United's indemnity obligation for defense costs. It did, however, subsequently determine that Insureds need only satisfy a single self-insured retention. (3/13/07 Order, Docket No. 543.)

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

4

The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

### A.  Defense Costs

The Court first addresses United's obligation to pay defense costs. Insureds concede that United's contractual obligation is not to defend but rather to pay defense costs.[4] Distilling the parties arguments to their core, this Court is called upon to determine (1) whether the *pro rata* time-on-the-risk allocation method should be applied to defense costs incurred in the State and Federal Actions because they cannot feasibly be separated; (2) the amount of Insureds' defense costs that United must reimburse; and (3) whether the SIR has been satisfied.

Insureds argue that United owes them $951,143.93 in non-reimbursed defense expenses from the State and Federal Actions less $20,000[5] because (1) the defense costs incurred in both the State and Federal Action are inseparable and thus should be allocated in the same way as the obligation to indemnify the $31 million global settlement; i.e., under a *pro rata* time-on-the-risk allocation method; (2) the total amount of defense expenses to

---

[4]Unlike United, this Court found that GenStar and Specialty National had a duty to defend. (2/11/04 Order at 9, Docket No. 34.)

[5]This figure represents the $100,000 SIR less the $80,000 difference between $10.25 million GenStar paid as settlement and the $10.33 million allocated share to GenStar under the time-on-the-risk method adopted by the Court.

be allocated is to be determined by adding (a) those paid by Specialty National, (b) those paid by GenStar, and (c) the amount Insureds' claim was paid on their behalf but has not yet been reimbursed ($389,146.82 paid by Third Party Administrator Gallagher Bassett Services and $561,997.11 paid by the City, for a total of $951,997.11); and (3) the $100,000 self-insured retention ("SIR") has been satisfied.

United, on the other hand, argues that it obligated to reimburse only $150,882.43 in defense expenses because (1) defense costs can and should be separated as between the State and Federal Actions, with United owing only those incurred in defense of the State Action; (2) a condition of United's policy requires that Insureds use a Third Party Administrator ("TPA") to request reimbursement and they failed to do so for most of the defense expenses they now seek; (3) a number of the defense expenses Insureds seek are duplicative, involve work on coverage issues, settlement enforcement, or other unrelated matters and thus are properly excluded; and (4) Insured's application of the $100,000 is improper because the SIR must be applied to defense expenses which were incurred prior to any loss payment; i.e., settlement amount.

This Court begins by analyzing whether there is a feasible way to divide the defense expenses incurred in the State and Federal Actions.

### 1. Divisibility of Defense Expenses Between State and Federal Actions

In its previous allocation Order addressing the $31 million settlement, this Court concluded that the economic damages flowing from the slander/libel/defamation claims in the State Action (that it previously determined were covered by United's policies) and the § 1983 claims asserted in the State and Federal Actions (that it determined were not covered by United's policies) were indivisible because they both addressed conduct that

harmed the Underlying Plaintiffs' business and business reputation. It decided that there was no feasible way to separate the various covered and uncovered causes of the Underlying Plaintiffs' economic damages reflected in depleted attendance, fewer shows, lower revenues, less quality bookings, less sponsorship, more debt and more expenses. Moreover, because Insureds had shown that the damages were continuing in nature, it further determined that these damages were also indivisible among United's, GenStar's, and Specialty National's triggered policies. Accordingly, it rejected United's argument that Insureds must do the impossible; i.e., divide indivisible continuing damages between the defamation and § 1983 claims in the State and Federal Actions and among triggered insurance policies, and held that the *pro rata* "time-on-the-risk" method of allocation should be applied to allocate liability among all insurers with triggered policies. (1/19/07 Order at 3-4, 10-11, Docket No. 354).

Despite United's arguments here and evidence that United instructed defense counsel in the underlying State and Federal Actions to submit separate bills,[6] this Court agrees with Insureds that there is no feasible way to separate the expenses incurred in defending the various covered and uncovered causes of the Underlying Plaintiffs' economic damages in

---

[6] *See* Pls.' Ex. C (1/23/03 email from GenStar's TPA requesting that Insureds' counsel at Plunkett submit separate bills and Plunkett's response that it would attempt to do so where possible); Pls.' Ex. K (11/24/03 letter from United's counsel to Gallagher informing that insurers had instructed defense counsel to maintain separate billings for the State and Federal Actions); Def.'s Ex. 20 (9/4/03 letters to City's counsel, Howard & Howard, and City Manager's counsel, Pepper Hamilton, instructing (at 5-6) that separate bills each month should be prepared for the State and Federal Actions, with the State Action bill being submitted to United, GenStar and Specialty National and the Federal Action bill being submitted to GenStar and Specialty National only); Def.'s Ex. 12 (8/5/03 letter from Gallagher to United's counsel enclosing separate State and Federal Action bills from Plunkett firm).

both the State and Federal Actions because (1) they derive from a common nucleus of operative facts, and (2) the proof of economic damages is the same for the covered slander/libel/defamation and uncovered § 1983 claims. Similarly, all defense expenses that served to facilitate the global settlement of the State and Federal Actions cannot be divided.[7] Accordingly, this Court determines that the *pro rata* "time-on-the-risk" method of allocation should be applied to allocate defense expenses among all insurers with triggered policies. The cases cited by this Court in its earlier allocation decision also support its decision here. *See Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp.2d 530, 544-45 (W.D. Mich. 2003) (holding that it was fair to apportion defense costs among insurers in a manner consistent with *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 594 N.W.2d 61 (Mich. Ct. App. 1998)). *See also Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 4:01-CV-157, 2005 WL 1610663 (W.D. Mich. July 1, 2005) (predicting that the Michigan Supreme Court would apply the *pro rata* "time-on-the-risk" allocation approach under circumstances similar to those presented here).

Application of that method of allocation here results in United owing one-third of expenses incurred in the defense of the State and Federal Actions. Two United policy periods were triggered, while three total periods were involved in the defense of the State and Federal Actions. Thus, two-thirds of the total defense costs would be allocated to United's policy periods, with GenStar and United sharing 50% of that responsibility. (*See* Insureds' Br. at 15-16).

---

[7] *See* Pls.' Ex. C (1/23/03 email response from Plunkett to request for separate bills); Pls.' Ex. D (P. Kensicki, Pls.' insurance expert, Dep. at 138-39); Pls.' Ex. E (Tucker Aff. at ¶¶ 5-8).

Before apportioning the total amount of expenses incurred in the State and Federal Actions, this Court must first address several issues United raises concerning the amount of non-reimbursed defense expenses Insureds claim they are owed.

## 2. Amount of Insureds' Non-Reimbursed Defense Costs

In determining the amount of Insureds' non-reimbursed defense costs, the Court first considers United's argument that, because Insureds' failed to comply with a policy condition requiring use of a Third Party Administrator ("TPA") when seeking reimbursement of defense costs, it has an obligation to reimburse only those defense costs submitted through the TPA.

### a. Policy Requirement of Use of Third Party Administrator

United's policies with Insureds require that they use a TPA for claims administration and further require the TPA to "[m]aintain accurate records of all reported claims and details with respect to loss and expense payments." (Def.'s Ex. 4, Package Policy at 9-10.) Insureds contracted with Gallagher Bassett Services, Inc. ("Gallagher") to perform these claims administration services. (Def.'s Ex. 5.)

United argues that (1) under its policies, defense expenses were to be paid by Insureds and/or the TPA; (2) the TPA was to notify United of all qualified claims or losses; and (3) the TPA was to submit these to United for reimbursement. It is United's position that, with the exception of allowable defense expenses in the amount of $150,882.43, Insureds failed to comply with this policy condition and are thus precluded from obtaining additional defense expenses. The following background facts are pertinent to this discussion.

After the underlying State and Federal Actions were settled, Gallagher submitted a formal demand for reimbursement of $389,146.82 in defense costs, less the $100,000 SIR, or $289,146.82 to United. (Def.'s Ex. 22, Gallagher 6/6/04 email with attached Payment Report/Spreadsheet.)

On July 28, 2004, United's counsel responded that it owed only $150,882.43 after deducting: (1) amounts previously disputed:[8] (a) $17,178.66 in O'Reilly firm fees for work done on matters unrelated to the underlying litigation, and (b) $46,725.37 for sound

---

[8] *See* Def.'s Ex. 19 at 8-9 (4/1/03 letter from United to Carufel regarding review of O'Reilly firm bill, deducting disputed amounts, and deducting 50% of remaining defense costs per cost-sharing agreement with GenStar).

*See also* Defs.' Ex. 27 (5/27/03 letter from P. Adams at Gallagher enclosing copies of unpaid bills for expert and court costs and legal fees for February and March 2003 from Plunkett for the State Action; observing that United should pay 50% of allowed expenses in light of 50/50 share agreement with GenStar, that the Kolano sound expert fees in the amount of $48,974.12 for 7-16-02 through 12-13-02 should not be paid because they were hired by the O'Reilly firm and that firm was taken off the case as of 7-26-02, and that $960.95 is for work associated with the Federal Action that may or may not be reimbursing; and asking for advice of the submitted invoices); Defs.' Ex. 35 (6/2/03 email from United's counsel to Gallagher acknowledging receipt of Ex. 27 and observing that they had not received earlier Plunkett firm bills from July 2002 through December 2002 and 6/3/03 email response confirming overnight delivery of all invoices for defense costs paid by Gallagher as of that date); Pls.' Ex. H at 2 (6/23/03 letter from United's counsel observing that (1) "[a]ccording to statements and invoices received from the Service Organization, the Assured has already incurred in excess of $489,206.62 in defense costs;" (2) pursuant to counsel's line-by-line review, certain amounts were deducted, resulting in allowable costs of $326,922.98, which were then cut in half (reflecting the 50/50 sharing arrangement with GenStar); and (3) $163,461.49 was to be applied to United's policies, thus exhausting the $100,000 SIR); Def.'s Ex. 12 (8/5/03 Gallagher letter to United's counsel attaching separate June 2003 billings from Plunkett & Cooney); Pls.' Ex. K (11/24/03 letter from United's counsel to Gallagher observing that (1) United's counsel had been provided with a number of invoices from Plunkett & Cooney for review; (2) review of the Plunkett and O'Reilly bills revealed a "total amount of all defense expenses incurred by former defense counsel equaled $564,407.24," that "the invoices contained substantial amounts incurred in connection with uncovered claims," that "[a]fter disallowing the uncovered expenses $385,554 remain," and United's 50% share of the defense costs is $192,777).

engineers Kolano & Saha; (2) one-half of the remaining amount owed to the O'Reilly firm that was to be paid by GenStar pursuant to an agreement United had with GenStar; and (3) the $100,000 self-insured retention (SIR). (Def.'s Ex. 23 at 1-2, 7/28/04 letter from United's counsel to Insureds' counsel at Garan Lucow firm.) United's counsel informed Insureds' counsel that, although it was difficult to reconcile the figures in Gallagher's Payment Report/Spreadsheet with those provided in its earlier correspondence, it would use the figures in the Payment Report and was prepared to reimburse the City $150,882.43 as covered defense expenses through June 5, 2004. (*Id.* at 1-2.) Alternatively, United offered "to accept the City's claimed out-of-pocket expenses of $389,146.32 less the $100,000 Self-Insured Retention, or $289,146.82, in exchange for a dismissal" of this coverage action. (*Id.* at 2.) Insureds did not accept this settlement offer.

Subsequently, on December 21, 2006, after concerns arose during discovery of Insureds' claims of non-reimbursed defense costs, United sent Insureds a check for $150,882.43 "[t]o finally resolve the issue of potential liability for defense expense" as well as an offer to settle the amount United owed on the $31 million global settlement. (Def.'s Ex. 25, 12/21/06 letter from United's counsel to Plaintiffs' coverage counsel.) Insureds rejected both offers, returning to United the $150,882.43 check. (Def.'s Ex. 26, 1/12/06 letter from Insureds' coverage counsel.) They also reminded United that, although it has contested some defense costs, it acknowledged that it owed "*at least* $150,882.43" in defense costs but had not yet paid even the amount it admitted it owed. (*Id.*) Insureds also disputed United's claim that it had not been advised of additional defense expenses owed, reminding United that they had repeatedly advised that defense costs were greater than $150,882.43 and had provided supporting evidence. (*Id.* at 2.)

11

United argues that Insureds' requests for defense costs other than the $389,146.82 formally requested on June 6, 2004, must be denied as they were not submitted through its TPA, Gallagher Bassett Services, Inc., a condition set out in United's policies. Contrary to United's arguments here, there is evidence that its counsel, Lord Bissell and Brook, requested and received additional bills for defense costs, subjected such bills to a line-by-line review, and deducted certain disputed amounts.[9] United's counsel also informed TPA Gallagher that defense counsel had been instructed by the insurers to maintain separate billings for the State and Federal Actions and "to provide copies of only the State suit invoices to United National, as United's coverage for the Federal suit had been exhausted." (Pls.' Ex. K, 11/24/03 letter from United's counsel to Gallagher.) In light of the above, this Court agrees with Insureds. United cannot rely on a condition in its policy requiring use of a Third Party Administrator when its own counsel waived that condition. Because defense counsel was instructed to send bills directly to its coverage counsel, Lord Bissell & Brook, United is estopped from arguing that its indemnification obligation for defense costs is limited solely to bills submitted through the Third Party Administrator.

---

[9] *See* fn 8. *See also* Defs.' Ex. 36 (4/9/04 email to TPA Gallagher, United, GenStar and Specialty National attaching final invoice in State Action from Insured Counsel Howard & Howard); Defs.' Ex. 22 (6/6/04 email from Gallagher to United notifying that defense counsel has been copying United's counsel directly on all correspondence); Pls.' Ex. G, Adams (Gallagher Branch Manager) Dep. at 147-48, 159, 204-05 (same); Pls.' Ex. Q (9/7/04 invoice from Insureds' counsel Garan Lucow to United, GenStar and Specialty National regarding enforcement of settlement agreement and release, requesting that each submit 1/3, or $6,774.08); Def.'s Ex. 28 (9/13/04 response letter from United's counsel to Insureds' counsel at Garan Lucow firm reminding that United in 7/28/04 letter advised that it was not sharing defense costs in the Federal Action or paying costs associated with settlement compliance).

The Court now considers United's arguments that (1) it has not received supporting evidence for the amount of defense expenses Insureds claim United owes them; (2) the evidence that has been produced cannot be reconciled; and (3) it has the right to challenge some of the claimed defense expenses.

### b. Evidence Supporting Insureds' Claimed Defense Expenses

Setting aside United's argument that it has not yet received all of the documents supporting Insureds' claim for defense expenses, this Court agrees with United's argument that it is impossible to reconcile the amounts discussed in the evidence it does present.[10] Part of this problem could be, as United suggests, that some of the amounts reflect deductions consistent with the United/GenStar/Specialty National sharing agreements while others do not. (United Br. at 12, n.7.) The Court also agrees with United's argument that it has the right to challenge some of the claimed defense expenses. These include duplicated amounts; law firm work on disqualification motions, coverage issues, or other work unrelated to the defense of the underlying State and Federal Actions; O'Reilly bills for work after it was disqualified; and post-settlement expenses. Accordingly, to allow the parties and the Court to fully and fairly address this issue, this Court ORDERS the following.

---

[10] *Compare* Def.'s Ex. 24 and Brief at 7, n.37 (Carufel Aff. at ¶¶ 18-21 discussing Table of City's Payments of non-reimbursed defense expenses in the amount of $561,997.11) *with* Def.'s Ex. 22 (6/6/04 email from Gallagher to United's Counsel with list of defense expense payments totaling $389,146.82), Def.'s Ex. 23 (7/28/04 letter from United's counsel to Garan Lucow with attached list of payments through June 30, 2004 from Gallagher ("Payment Report") showing $389,146.82 in defense expenses that United advises it is unable to reconcile with earlier figures discussed in June 23, 2003 and November 24, 2003 correspondence), and P's Ex. K (11/24/03 letter from United's counsel to Gallagher discussing submitted defense expenses in the amount of $564,407.24).

Within 30 days of this Order, Insureds shall produce all evidence supporting the claim for defense expenses, including the additional $561,997.11 Insureds seek here.[11]  United shall have an opportunity to raise challenges, and Insureds shall have the opportunity to respond.[12]  All unresolved disputes as to defenses expenses will be submitted to a Special Master, to be appointed pursuant to Fed. R. Civ. P. 53(a)(1)(C), for a Report and Recommendation ("R&R").  That R&R will determine the total amount of allowable, non-reimbursed defense expenses, apply the *pro rata* "time-on-the-risk" allocation method, and determine whether the $100,000 SIR has been satisfied.

## B. Consequential Damages

At the March 15, 2007 hearing in this matter, the Court ruled that Insureds were entitled to consequential damages as a matter of law based on the policy language and United's breach of the parties' insurance contract by failing to satisfy its indemnification obligation as a result of the global settlement of the underlying State and Federal Actions. The Court's remaining tasks require it to determine (1) the accrual date for claimed consequential damages; (2) whether Insureds' properly mitigated their consequential damages; and (3) whether the amount of consequential damages owed by United should

---

[11]There is some dispute whether United received and reviewed evidence supporting the additional $561,997.11.  United argues that it did not receive documents supporting the figures listed by the City as non-reimbursed defense expenses and attached to the Carufel Affidavit (Brief at 11-12), but it is undisputed that in a November 24, 2003 letter, United confirmed that it had received and reviewed bills for defense expenses in the amount of $564,407.24 (Pl.'s Ex. K).

[12]Because Insureds must clarify the amount of defense expenses they claim United is obligated to reimburse and both parties will have an opportunity to challenge and defend whether certain amounts are in fact defense costs incurred in the underlying State and Federal actions, the Court need not consider United's failure to disclose argument.

be consistent with this Court's holding that it is liable for only one-third of the $31 million settlement. The Court begins by summarizing the parties' opposing positions and by providing the relevant background facts concerning the global settlement of the underlying State and Federal Actions.

### 1. Opposing Positions

Insureds argue that, as a consequence of United's breach of its indemnity obligation as to the $31 million global settlement of the State and Federal Actions, they used $6 million from City funds and $25 million from the sale of judgment bonds in order to finance the $31 million settlement. (Pl.'s Ex. S, Carufel Aff. at ¶¶ 22-37.) An additional $10 million was paid from City funds and reimbursed three months later when the judgment bonds became available.

These arrangements, Insureds argue, caused losses: (1) in interest on the $10 million in City-funded settlement proceeds for the three-month period between the underlying settlement on March 22, 2004, and the availability of bond proceeds on June 29, 2004; (2) in interest for the $6 million in City-funded proceeds, beginning on January 2, 2005, when the City paid that amount into an escrow account for the Underlying Plaintiffs, thus satisfying its obligations under the global settlement; (3) in interest payments made and to be made on the $25 million judgment bond debt; and (4) in fees and other one-time costs that were incurred in connection with the sale and partial defeasance of the judgment bonds. (*Id.*)

The dollar amounts Insureds claim United owes them for each category of losses as of February 6, 2007, is as follows.

For items (1) and (2), $878,074 is owed and continues at a rate of $371/day until United pays its portion of the $31 million settlement. (Pl.'s Ex. V, Crawford Report at Tab 4; Pl.'s Ex. W, Supplemental Crawford Report at Tab 4.)

For item (3), $2,539,150 is owed and continues at a rate of $1,695/day until United pays its portion of the $31 million settlement. (Pl.'s Ex. V, Crawford Report at Tab 3; Pl.'s Ex. W, Suppl. Crawford Report at Tab 3.)

For item (4), $389,000.55 is owed, consisting of: (a) $368,279.55 in bond counsel fees, underwriter fees, and the like incurred in connection with judgment bond issuance; and (b) $20,730 for bond counsel fees and expenses incurred in connection with partially defeasing the judgment bonds after receipt of GenStar and Specialty National's settlement amounts. (Pl.'s Ex. S, Carufel Aff. ¶¶ 34-37 and related exhibits.)

United, on the other hand, argues that: (1) because Insureds' failed to timely produce documents supporting their claimed consequential damages, these claims should either be denied or additional discovery should be allowed; (2) because its policy language requires a different accrual date for consequential damages, the amounts Insureds seek must be recalculated; and (3) Insureds failed to properly mitigate their damages when they used $10 million of settlement proceeds from GenStar and Specialty National to repay the City's general fund rather than using it to pay off the judgment bonds.

### 2. Settlement Facts

To analyze Insureds' consequential damages arguments, the following settlement history is relevant.

On March 22, 2004, the Sterling Heights City Council approved the $31 million global settlement of the Underlying State and Federal Action.

16

On March 23, 2004, the City wired $10 million to Strobl Cunningham IOLTA trust account from the City's general fund.[13]

On June 29, 2004, $25 million in judgment bonds became available to the City. The $25 million judgment bonds require payment of interest on a set schedule until they are paid or called. Bonds due after October 1, 2009 are callable at par. (Pl.'s Ex. S, Carufel Aff. at ¶ 26.) The City, through JP Morgan, wired $15 million to the Strobl Cunningham IOLTA trust account. The $15 million was received from the sale of judgment bonds. (Pl.'s Ex. S, Carufel Aff. ¶ 24.) The City used the other $10 million to replace the amount taken from its general fund on March 23, 2004. (*Id.* at ¶ 32.)

On January 3, 2005, the City wired $6 million from its general fund into an escrow account for the Underlying Plaintiffs. (Pl.'s Ex. S, Carufel Aff. ¶ 25 an related exhibit.)

On January 27, 2006, this Court determined that United's duty to indemnify for defense costs and damages is triggered as a result of the slander/libel/defamation claims asserted in the underlying State Action. (Docket No. 309.) That same date, this Court determined that GenStar's and Specialty National's policies were triggered for the § 1983 claims asserted in the underlying State and Federal Actions.

In June 2006, GenStar agreed to settle Insureds' coverage claims against it. Specialty National also agreed to settle shortly thereafter.

On June 27, 2006, in connection with Insureds' settlement with GenStar, the City received $8,013,736 from GenStar's escrow account, representing the first $8 million of

---

[13]The City claims it lost all interest that it could have earned on this amount until June 29, 2004, when the City received $10 million from the sale of judgment bonds. (Pl.'s Ex. S, Carufel Aff. at ¶¶ 22-23.)

GenStar's $10.25 million settlement, plus $13,736 in interest earned from May 15-31, 2006. (Pl.'s Ex. S, Carufel Aff. at ¶ 28.) That same date, City also received $2,250,000 from GenStar, representing the balance of the $10.25 million settlement of Insureds' coverage action against GenStar. (*Id.* at ¶ 29.) On July 26, 2006, the City received a final $25,299.22 from GenStar's escrow account, representing the interest earned on the account from June 1, 2006 through June 25, 2006. (*Id.* at ¶ 31.) An order of dismissal (with prejudice and without costs) was entered on July 27, 2006. (Docket No. 347.)

On July 20, 2006, in connection with Insureds' settlement with Specialty National, the City received $8.5 million, representing the entirety of the settlement of this coverage action as to Specialty National. (Pl.'s Ex. S, Carufel Aff. at ¶ 30.) An order of dismissal (with prejudice and without costs) was entered on August 22, 2006. (Docket No. 353.)

The above funds, totaling $18.75 million for indemnity and $39,035.22 in interest earned in connection with the GenStar funds, were distributed by the City as follows: $9,669,134 to the City's bond-paying agent, with the remainder (approximately $9 million) to the City's general fund. (Pl.'s Ex. S, Carufel Aff. at ¶ 32.)

### 3. Analysis

#### a. Accrual Date

Insureds argue that its consequential damages started accruing on the March 22, 2004 date it reached a global settlement in the underlying State and Federal Actions. In contrast, United argues that consequential damages, if any, accrued on January 17, 2007, when this Court determined that United's allocated share of the $31 million settlement was to be one-third, or $10.33 million. The Court disagrees with both parties. Consistent with the Insuring Agreement and Definition Sections of United's policy, the accrual date for

18

consequential damages would be January 27, 2006, when this Court held that there was coverage under United's policies for certain of the claims in the underlying State Action which was part of a global settlement that Insureds and the Underlying Plaintiffs entered into on March 22, 2004.[14]  The latter January 17, 2007 allocation order determined only United's share of the $31 settlement, not its legal obligation to pay an amount assumed by Insureds under that settlement agreement.  That was determined one year earlier, on January 27, 2006.  Contrary to United's arguments, the plain language of United's policy supports this conclusion.[15]  As this Court previously observed, to recover a settlement

_____

[14]This interpretation is also consistent with United's contractual duty to reimburse defense costs as opposed to a duty to defend.

[15]United's policy provides, in its Insuring Agreements, as follows:

> COMPREHENSIVE GENERAL LIABILITY:  The <u>Company agrees</u>, subject to the policy limitations, terms and conditions, <u>to indemnify</u> the ASSURED for <u>all sums</u> with the ASSURED is <u>legally obligated to pay by reason of the liability</u> imposed upon the ASSURED by law or <u>assumed by the ASSURED under contract or agreement, for damage direct or consequential</u>, and expenses, all <u>as more fully defined by the term ULTIMATE NET LOSS</u>, on account of PERSONAL INJURY, . . ., arising our of any OCCURRENCE from any cause . . ., happening during the PERIOD OF INSURANCE.

(Def.'s Ex. 4, Package Policy at 26) (emphasis added).  "Ultimate net loss" is defined as:

> the total sum which the ASSURED <u>is obligated to pay</u> <u>because of loss</u> or damage <u>covered under any Section of this policy</u>, either through adjudication or compromise, after making proper deductions for all recoveries and salvages.

> ULTIMATE NET LOSS also includes . . . all sums paid as . . . expenses of lawyers . . . and other persons for litigation, settlement, adjustment and investigation of claims and SUITS which are paid as a consequence of any occurrence covered hereunder.

(*Id.* at 17 (emphasis added).)

payment, Insureds need only show potential liability and a settlement that is reasonable. (1/17/07 Order at 5, n.5.)

### b. Amount of Consequential Damages

In light of the accrual date set forth above, the amount of consequential damages Insureds claim are owed must be recalculated. Accordingly, to allow the parties to fully and fairly address this issue, the Court ORDERS the following.

Within 30 days of this Order, Insureds shall produce all evidence supporting their claims for consequential damages. United shall have an opportunity to raise challenges, including the mitigation and allocation claims raised here, and Insureds shall have an opportunity to respond.[16] All unresolved disputes as to consequential damages will be submitted to a Special Master, to be appointed pursuant to Fed. R. Civ. P. 53(a)(1)(C), for a Report and Recommendation ("R&R"). That R&R will determine all issues concerning consequential damages, including United's failure to mitigate and allocation arguments.

The Court now addresses the final unresolved issue raised in Insureds' motion for summary judgment.

### C. Prejudgment Interest

---

[16]In light of this, the Court need not consider United's discovery arguments.

Insureds argue that they are entitled to prejudgment interest pursuant to Michigan law, Mich. Comp. Laws § 600.6013(8).[17] Although Michigan law provides that prejudgment interest is to be calculated from the date the complaint is filed (July 18, 2003), Insureds argue that prejudgment interest on varying amounts should be calculated from varying dates for varying reasons: (1) from April 21, 2004, for United's one-third portion of the $31 million global settlement, or $10.33 million; (2) from April 21, 2004 for $931,143.93 they claim United owes for non-reimbursed defense costs; (3) from June 25, 2004 for $368,270.55 in bond expenses; (4) from June 27, 2006 for $20,730 in bond expenses; and (5) from December 1, 2004; April 1, 2005; October 1, 2005; April 1, 2006; and October 1, 2006 for $2,327,331 in debt service payments. (Pl.'s Br. at 18-20, referenced footnotes and exhibits.)

United, on the other hand, ignores Mich. Comp. Laws § 600.6013(8), and argues that (1) because interest is sought as consequential damages, an award of prejudgment interest would be an improper double recovery; (2) Insureds' have not adequately explained how

---

[17]Mich. Comp. Laws Ann. § 600.6013(8) provides, in pertinent part, that:

> [F]or complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

they arrived at their calculations; and (3) prejudgment interest, if awarded, must be done so in a manner that represents only United's allocated share.

Because issues concerning defense costs and consequential damages are to be referred to a Special Master and those issues will affect any award of prejudgment interest, all prejudgment issues will also be referred to the Special Master for a R&R. That R&R will determine (1) whether prejudgment interest should be awarded, (2) the amount to be awarded, and (3) whether any award of prejudgment interest should be allocated under a *pro rata* "time-on-the-risk" method.

## IV. Conclusion

For the above stated reasons, Plaintiffs' motion for summary judgment [395] is GRANTED IN PART and DENIED IN PART.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 1, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 1, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager